[No. A063319. First Dist., Div. Three. June 9, 1995.]

COMMUNIST PARTY OF THE UNITED STATES OF AMERICA,
Plaintiff and Respondent, v.
522 VALENCIA, INC., et al., Defendants and Appellants.

COUNSEL

Laura Woodward and Allan Brotsky for Defendants and Appellants.

Richard D. Silberman, Hoffman, Finney & Klinedinst, Malcolm E. McLorg and Ellen Lake for Plaintiff and Respondent.

OPINION

MERRILL, J.—This is an appeal from a judgment of the superior court finding that respondent Communist Party of the United States of America (hereinafter respondent or the Party) is the beneficial owner of appellant public benefit corporations, 522 Valencia, Inc. (522 Valencia) and Pacific Publishing Foundation, Inc. (Pacific Publishing), and that all of the assets of both corporations are held in constructive trust for the benefit of respondent; ordering individual appellants Carl Bloice, Esther Brown, Mary Idosidis, William Sorro, Sally Sweet and Lloyd Vandever and both corporate appellants to assign, transfer and convey all of the assets of both corporations, including their corporate names, bank accounts, records and real and personal property, to entities designated by respondent; and ordering the individual appellants to render an accounting for all actions taken, income received and expenses incurred by the two corporations from January 1, 1992, to the date of such accounting. Appellants contend that the trial court's judgment was erroneous because respondent lacked standing to sue; there was no basis for the imposition of a constructive trust; the alter ego doctrine was erroneously applied; the California Attorney General was an indispensable party because the action sought the disbursement of the assets of public benefit corporations; and the judgment was not supported by substantial evidence. In addition, they contend that the trial court erred in assessing costs against the individual appellants. For reasons which follow, we reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

#### The Party

Respondent Party is an unincorporated association with headquarters in New York City. Respondent's highest internal authority is the National Convention, held every four years. According to respondent's constitution, the respondent is organized on the principles of "democratic centralism" and "collectivity," theoretically under which all members and leaders are obliged

to fulfill any decisions arrived at by the majority, and factions are disallowed.

At respondent's 1991 National Convention, disputes arose over the payment of dues, and many delegates from various areas of the country, including Northern California, were denied access to the convention. In February 1992, the Northern California District of the Party voted to disaffiliate from the national party. As a result, the total membership of the Party decreased from 2,500 to approximately 1,200. The individual appellants, along with other members of the Northern California District, formed a new organization called the "California Committee of Correspondence."

### The Corporations

Party members testified that respondent established and controlled both appellant corporations, 522 Valencia and Pacific Publishing. However, none of the incorporating documents, official records or documentation pertaining to the two corporations indicated that they were founded by the Party or in any way controlled by it, or that the Party owned any of the corporations' assets.

The purpose of 522 Valencia as stated in its 1974 articles of incorporation was "[p]rimarily to engage in the specific business of managing and operating any buildings or other real property which may be owned, leased, or controlled by this corporation." In 1992, it was reorganized under the Nonprofit Public Benefit Corporation Law for public and charitable purposes.

The corporation's principal asset is a building at 522 Valencia Street in San Francisco.[1] The corporation rented the top floor to the Northern California District of the Party, the back portion of the second floor to Pacific Publishing, and the ground floor to a bookstore. The corporation also owned real property in San Jose, at which another bookstore was located.[2]

At various times, the 522 Valencia corporation loaned between $10,000 and $20,000 to the Party. According to Richard Fallenbaum, a Party press

---

[1] This building was originally deeded to the corporation by Samuel and Mollie Gold. There is evidence in the record indicating that Mollie Gold had been a member of the Communist Party.

[2] The San Jose property, located at 950 South First Street, was the location of a bookstore named Bread and Roses, founded by James R. Lindsay in 1972. Lindsay purchased the property primarily with his own money obtained by the sale of his personal residence, and with contributions from friends. In 1986, Lindsay donated the San Jose property to the 522 Valencia corporation, reserving to himself a life interest in the property. Subsequently, in 1990, Lindsay gave the San Jose property to the corporation as an outright gift without

director and former chairman of the district finance committee, the funds held by both 522 Valencia and Pacific Publishing "were available to the Party [and] were considered resources of the Party." He testified that both corporations secured their assets from large gifts, donations and bequests in wills by Party members, and that the Party considered 522 Valencia one of its "main repository of funds" received in this way.

Appellant Vandever testified that prior to February 1992, he was a member of the Party, and that he signed the articles of incorporation for 522 Valencia in 1974 at the request of Mickey Lima, the Party's district organizer at that time. At the time of trial, appellants Vandever, Esther Brown, Lee Brown, Sweet, and Sorro were on the board of directors of 522 Valencia. All had been members of the Party up until they left it in 1992. Sweet was also a member of the finance committee of the Northern California District of the Party.

In 1990, the national review commission of the Party ordered an audit of the Northern California District. As part of this audit, Party member Carl Reinstein reviewed the books and records of both 522 Valencia and Pacific Publishing. Reinstein met with appellant Sweet, the treasurer and chief financial officer of 522 Valencia, and with appellant Idosidis, the president of Pacific Publishing. When Sweet met with Reinstein, she showed him the financial records for 522 Valencia over which she had custody. Sweet testified that she did this because she had been told that there would be an audit; she assumed that it was a standard corporate financial audit. Reinstein's audit stated that 522 Valencia derived its income from rents, donations, mortgages held by the corporation, and "miscellaneous income."

Pacific Publishing was founded in 1941 as a nonprofit corporation by three individuals not parties to this litigation, for the purpose of distributing and disseminating books, tracts, newspapers, periodicals and other written material "relating to the advancement, uplift and liberation of mankind, and the enrichment of the lives of the common people, or designed to impart a fuller popular understanding and appreciation of the events of human history, both past and current, or which will impart information to the electorate so that it may be better informed upon the issues and matters presented in and at local and general elections . . . ."

Until 1986, Pacific Publishing was the owner and publisher of the People's World, a self-described "working class, Marxist oriented weekly newspaper" distributed in the western United States. The sources of financial

retaining a life interest. Lindsay was a member of the Communist Party from 1942 until the disaffiliation of the Northern California District from the national party in 1992.

support for the People's World were its readers, supporters, and its base of approximately 3,300 subscribers, made up of both individuals and organizations. The corporation raised funds through special events and solicitations. The Party also sponsored a yearly fund drive to raise money for the People's World.

At the time of trial, appellants Idosidis and Sweet were on the board of directors of Pacific Publishing; appellant Bloice resigned from membership on the board in 1992. All had been Party members until they withdrew from it in 1992. Both Sweet and Idosidis testified that they exercised their own judgment in making decisions for Pacific Publishing; that no one had ever told them how to vote while they were on the Pacific Publishing board of directors; and that no one had ever asked them to resign from the board of directors.

Although witnesses for respondent testified that Pacific Publishing had been "set up" by the Party and was subsequently "controlled" by it, none of these witnesses had any personal knowledge that the Party had established the corporation. There is no mention of the Party in any of the documents connected with the formation of Pacific Publishing, and no evidence in the record that any of the three individuals forming the original corporation were members of the Party. Party witnesses acknowledged that the People's World newspaper itself never contained any statement or indication that it was affiliated with the Party.

In 1986, Pacific Publishing entered into a joint venture agreement with a separate corporation, Long View Publishing (Long View), the publisher of a Party-oriented newspaper in New York City called the Daily World. The two corporations merged the newspapers into a single national publication called the People's Daily World. Under the agreement between Pacific Publishing and Long View, Pacific Publishing ceased publication of the People's World, and was reimbursed by Long View for editorial services on the new newspaper. Three individuals connected with the Party and with Long View were added to the Pacific Publishing board of directors to facilitate financial transactions on behalf of the merged newspaper in New York. In other respects, the new directors did not participate in actions of the Pacific Publishing board of directors. Respondent's witnesses testified that after the merger of the newspapers in 1986 virtually all of Pacific Publishing's finances came from Long View. Nevertheless, Pacific Publishing itself remained a nonprofit corporation legally separate from Long View and had its own employees.

In December 1991, Long View fired the editor and certain members of the staff of the merged newspaper in New York. Thereafter, Pacific Publishing

informed Long View that it considered the agreement between the two corporations to have been breached, and severed all connections between Pacific Publishing and Long View. Pacific Publishing began publishing its own separate newspaper, called News. for a People's World, identical in format and intent with its former newspaper, People's World.

### The Lawsuit

The Party filed suit against 522 Valencia, Pacific Publishing and the individual appellants, alleging that it controlled, dominated and operated the two corporations as "alter egos" of itself, and that it was the beneficial owner of all the assets held by both corporations.[3] The complaint alleged causes of action against the individual appellants for breach of contract, breach of fiduciary relationship, conspiracy to breach contract, and interference with contractual relationships. It sought a declaration that the Party was the beneficial owner of all property and assets held in the names of the two corporations, with "the right to hold fee title to the real property" belonging to 522 Valencia, and the right "to name the persons who are to be officers and directors" of the two corporations; and a constructive trust over both corporations and their assets, together with an accounting for all of their income and expenses. In its trial brief filed with the superior court, respondent reiterated its position that both 522 Valencia and Pacific Publishing are alter egos of the Party.

At the commencement of trial, appellants moved for judgment on the pleadings on the grounds of lack of standing, failure to state a cause of action, and illegality of the alleged contract between respondent and appellants. It does not appear that the trial court ruled on these motions at that time. After the parties had presented all of their evidence, the parties entered into a stipulation for dismissal of all claims for damages against the individual appellants. Following closing argument the trial court directed each side to submit a proposed judgment with a "wish list" as to what they felt the court's decision should be.

---

[3]Among other things, the complaint alleged that: (1) up until 1992, both corporations were "controlled, dominated and operated by the Party as its alter ego," and were "mere shells, instrumentalities and conduits through which the Party carried on its operations"; (2) the Party exercised "complete dominance and control over [the] corporations to such an extent that any individuality or separateness" of either corporation "did not exist"; (3) the Party caused both corporations "to be organized, operated and endowed"; (4) all of the directors and officers of both corporations were members of the Party, and had both a contractual and a fiduciary relationship with the Party; and (5) "most of the assets that are owned in the names of 522 Valencia and Pacific Publishing were contributed to those corporations by persons who believed and intended that their gifts or bequests to those entities would result in the contributed property being used for the purposes of and subject to the control of the Party."

Thereafter, the trial court issued a tentative decision in favor of respondent. The trial court found on the basis of the alter ego doctrine that the appellant corporations had no separate identity or existence apart from the Party, that the Party had used the corporations for its own purposes since their inception, and that it was the beneficial owner of both corporations. The trial court stated its intent to order a constructive trust for the benefit of the Party in all the property and assets of both corporations. Appellants filed objections to the tentative decision and renewed their motions for judgment on the pleadings. The trial court denied the motions, and the tentative decision became the statement of decision.

Subsequently, the trial court granted a form of "interlocutory judgment" prepared by respondent. The judgment adjudged respondent the beneficial owner of both corporations; decreed that all the property and assets of both corporations were held in constructive trust for respondent's benefit; ordered the appellants to transfer and convey to an entity designated by respondent all of the property and assets of the corporations, including their corporate names, bank accounts, office equipment, automobiles, records, and "other miscellaneous property . . . in [their] possession or subject to [their] control"; ordered the individual appellants to render accountings for all actions taken, income received and expenses incurred by both corporations from January 1, 1992; and ordered the individual appellants to pay respondent's costs of suit. Thereafter, respondent filed a memorandum of costs. Appellants moved to strike and to tax costs on the grounds that all damage claims against the individual appellants had already been dismissed. The trial court denied the motions. Appellants filed a timely notice of appeal.[4]

### IMPOSITION OF CONSTRUCTIVE TRUSTS

Appellants make a number of arguments in their attack on the trial court's judgment.[5] We need not address all of the arguments individually, because we conclude that the trial court erred as a matter of law in imposing a

---

[4]The judgment states on its face that it is "interlocutory," apparently because of some anticipated future "judgment" to be entered against appellants after they present the results of their accountings of the corporations' affairs to the trial court. However, a judgment for an accounting, where the sole purpose of the accounting is to insure full and complete compliance with the provisions of a judgment ordering a surrender or other disposition of property and where no further determinations on the merits will be necessary, is final and appealable. (*Brown* v. *Memorial Nat. Home Foundation* (1958) 158 Cal.App.2d 448, 455 [322 P.2d 600, 72 A.L.R.2d 997].) All parties agree that the "interlocutory" judgment in this case is appealable.

[5]Among other things, appellants contend that because respondent's complaint essentially seeks to disregard the corporate appellants' status and take away all of their assets, it is in the nature of an action in quo warranto; that such an action may only be brought by the Attorney

constructive trust and in ordering appellants to convey the property of the corporations to an entity designated by respondent. The alter ego doctrine cannot be used to impute to respondent Party an ownership interest in appellant corporations or their property. Under the factual circumstances presented in this case, there is no legal or factual basis on which to find such an interest. Moreover, under respondent's own version of the facts and evidence, it is clear that its claims for relief are based on an application of the alter ego doctrine that is contrary to the law and on an illegal contractual relationship that is void and unenforceable as a matter of law.

■ A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. (*Pacific Lumber Co.* v. *Superior Court* (1990) 226 Cal.App.3d 371, 377 [276 Cal.Rptr. 425]; *Calistoga Civic Club* v. *City of Calistoga* (1983) 143 Cal.App.3d 111, 116-117 [191 Cal.Rptr. 571]; *Haskel Engineering & Supply Co.* v. *Hartford Acc. & Indem. Co.* (1978) 78 Cal.App.3d 371, 375-378 [144 Cal.Rptr. 189]; Rest., Restitution, § 160; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 305, pp. 1138-1139.) The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing. (*Martin* v. *Kehl* (1983) 145 Cal.App.3d 228, 237 [193 Cal.Rptr. 312]; *Nevarez* v. *Nevarez* (1962) 202 Cal.App.2d 596, 602 [21 Cal.Rptr. 70].)

The principal circumstances where constructive trusts are imposed are set forth in Civil Code sections 2223 and 2224. Section 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Section 2224 states that "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Under these statutes and the case law applying them, a constructive trust may only be imposed where the following three conditions are satisfied: (1) the existence of a *res* (property or some interest in property); (2) the *right* of a complaining party to that res; and (3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it. (*Martin* v. *Kehl, supra,* 145 Cal.App.3d at pp. 237-238; *Calistoga Civic Club* v. *City of Calistoga, supra,* 143 Cal.App.3d at p. 116; *Weiss* v. *Marcus* (1975) 51 Cal.App.3d 590, 600 [124 Cal.Rptr. 297].)

General; that standing to sue the corporate appellants sufficient to seize their property is not established by alleged control of some of their directors; that the trial court erred in basing its judgment on an application of the alter ego doctrine; that respondent cannot state any cause of action against any appellant; and that the judgment is not supported by substantial evidence.

█ The trial court concluded that the three conditions for imposing a constructive trust had been met in this case. It found that the property and assets of both appellant corporations rightfully belonged to respondent, and that the individual appellants "wrongfully retained those assets after ending their affiliation with the [P]arty." Significantly, the trial court expressly based this conclusion on its understanding of the alter ego doctrine, which it concluded allowed it to disregard the corporate existence of both 522 Valencia and Pacific Publishing "in order to avoid injustice." In support of this application of the doctrine, the trial court relied on its factual findings that both appellant corporations were created, financed, and controlled by respondent Party entirely for its own benefit.[6] The trial court used the alter ego doctrine to disregard the separate corporate existence of the corporate appellants; stripped them of all of their property, assets and corporate identities by imposing constructive trusts; and awarded them to respondent. This was error.

█ A constructive trust *cannot exist* unless there is evidence that property has been wrongfully acquired or detained by a person not entitled to its possession. (*Pacific Lumber Co.* v. *Superior Court, supra,* 226 Cal.App.3d at pp. 377-378; *Estate of Davis* (1985) 171 Cal.App.3d 854, 857 [217 Cal.Rptr. 734]; *Martin* v. *Kehl, supra,* 145 Cal.App.3d at p. 237.) Before a court can impose a constructive trust on the basis of a defendant's wrongful acquisition or retention of property under Civil Code section 2223 or 2224, there must be some other party rightfully entitled to that property. █ In this case, in order to conclude that appellants wrongfully retained the disputed property, there must be some basis for determining that respondent actually owned or was rightfully entitled to possession of it. However, there is absolutely no evidence in the record that respondent was the owner with legal title to the property and assets of the appellant corporations, or was ever intended to be. To the contrary, the undisputed evidence shows that the appellant corporations acquired ownership of their property and assets legally and rightfully in their own corporate capacity.

---

[6]In its statement of decision, the trial court said: "The court finds that the assets [of 522 Valencia and Pacific Publishing] in question belong to the Communist Party of the United States of America and that [appellants] wrongfully retained those assets after ending their affiliation with the [P]arty. [¶] The alter ego doctrine is, of course, usually invoked by third persons seeking to collect money, but there is nothing in the law that prevents [respondent Party] in this case from resorting to the doctrine in order to avoid injustice. Logic and fairness permit the court to disregard the corporate entities when the evidence offered by the parties justifies such a finding [citation]. [¶] The evidence is clear that [respondent] set up the corporations, financed them, benefitted from them, and controlled them in all respects. . . . [¶] . . . [I]n the present case, the court sees a total unity of interest and ownership in the [respondent] and the two corporations. If the corporations are treated as separate and apart by this court, a great inequity would be perpetrated."

In support of its decision the trial court stated that "[t]he weight of the evidence is that the corporations have been used since their inception, and will continue to be used, by the Communist Party to further the interests of the [P]arty." This may be so, but that in itself is not determinative of the issues in this case. 522 Valencia and Pacific Publishing may have responded to the wishes, adhered to the doctrine and sought to carry out the objectives of the Party, but that does not transform their property into an asset of the Party. The undisputed evidence was that there are various organizations and entities in the United States which are related to and supported by the Party and carry out the objectives of the Party, but whose assets are not owned by the Party.

Respondent argues, however, that under the circumstances of the case at bench the trial court was justified in finding that under the alter ego doctrine the Party was entitled to ownership of the property being held by 522 Valencia and Pacific Publishing. Rather than arguing that it had actual legal title to the corporations' assets, respondent asserts that "[i]t is reasonable to infer" from evidence in the record that it was *entitled* to ownership of these assets. Regarding 522 Valencia, respondent contends that because large gifts of money and property were given to the corporation by "active, long-time Party members," it would be "reasonable to infer that the donors intended that their gifts to the corporation were for the Party's benefit." The fallacy in this argument, however, is that even if we assume the property was given to the corporations to benefit the Party, this does not provide sufficient evidence that the Party was rightfully entitled to ownership, control or possession of this property. The San Jose property is a good example. The donor himself testified that he purchased the property with his own money, and that when he eventually gave it to 522 Valencia, he did not intend it as a gift, directly or indirectly, to the Party. There was no substantial evidence to contradict this testimony, which was supported by the documentary evidence.

As for the property of Pacific Publishing, respondent concedes that "[n]o evidence was introduced about particular assets belonging to" that corporation. Respondent apparently argues, however, that because Party members testified that it provided funding for the corporation, it was reasonable to infer that it was entitled to possession of all the corporation's assets and property. Respondent maintains that the funding came from the Party directly or by payments through Long View. Appellants said that it came from sales of and subscriptions to the corporation's publications, from fund drives, and from private donations directly to the corporation, as well as payments from Long View. Even if we assume that funding was provided as

contended by the Party, this does not provide sufficient evidence that the Party owned or was entitled to possession of all of the corporation's property and assets, particularly since respondent acknowledged that payments were made by Long View to Pacific Publishing for editorial services.

## DOCTRINE OF ALTER EGO

■ Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. (*Shapoff* v. *Scull* (1990) 222 Cal.App.3d 1457, 1469 [272 Cal.Rptr. 480], overruled on other grounds in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *NEC Electronics Inc.* v. *Hurt* (1989) 208 Cal.App.3d 772, 777 [256 Cal.Rptr. 441]; 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, p. 524.)

■ In general, the two requirements for applying the alter ego doctrine are that (1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice. (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [216 Cal.Rptr. 443, 702 P.2d 601]; *Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]; *Minifie* v. *Rowley* (1921) 187 Cal. 481, 487 [202 P. 673]; *Shapoff* v. *Scull, supra,* 222 Cal.App.3d at pp. 1469-1470.) The doctrine is applicable where some innocent party attacks the corporate form as an injury to that party's interests. The issue is not so much whether the corporate entity should be disregarded for all purposes or whether its very purpose was to defraud the innocent party, as it is whether in the particular case presented, justice and equity can best be accomplished and fraud and unfairness defeated by disregarding the distinct entity of the corporate form. (*Shapoff* v. *Scull, supra,* 222 Cal.App.3d at p. 1469; *Kohn* v. *Kohn* (1950) 95 Cal.App.2d 708, 718 [214 P.2d 71]; 9 Witkin, Summary of Cal. Law, *supra,* Corporations, § 12, p. 525.)

■ Nevertheless, persons who themselves control a corporation, who have used the corporate form of doing business for their benefit, who have dealt with and treated the corporation as a separate entity, or who have

otherwise by their actions expressly or impliedly recognized its corporate existence, may be estopped to deny the corporation's separate legal existence. (*Pacific Landmark Hotel, Ltd.* v. *Marriott Hotels, Inc.* (1993) 19 Cal.App.4th 615, 628 [23 Cal.Rptr.2d 555]; *Shapoff* v. *Scull, supra,* 222 Cal.App.3d at p. 1470; *Macrodyne Industries, Inc.* v. *State Bd. of Equalization* (1987) 192 Cal.App.3d 579, 582 [237 Cal.Rptr. 537], overruled on other grounds in *Beatrice Co.* v. *State Bd. of Equalization* (1993) 6 Cal.4th 767, 779, 783 [25 Cal.Rptr.2d 438, 863 P.2d 683]; *Aladdin Oil Corp.* v. *Perluss* (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239]; *Petersen* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 798-799 [327 P.2d 127]; *Wynn* v. *Treasure Co.* (1956) 146 Cal.App.2d 69, 76 [303 P.2d 1067].) "Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations. [Citations.]" (*Aladdin Oil Corp.* v. *Perluss, supra,* 230 Cal.App.2d at p. 614.) Thus, alter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form.

■ In this case, respondent has always treated both 522 Valencia and Pacific Publishing as corporations legally separate from itself. It paid rent, borrowed money, entered into contracts and agreements, corresponded with, and generally dealt with both appellant corporations as though they were separate corporate entities. There is no evidence in the record of any disregard of corporate form or legal formalities. To the contrary, respondent always carefully maintained a legal separation between itself and the corporate appellants.

Respondent now contends, however, that the individual appellants had a secret agreement with the Party to manage the appellant corporations for the *Party's* benefit, rather than for the purposes stated in the corporations' own articles of incorporation. As part of this purported contract, the appellants allegedly agreed that all corporate decisions would be made by the Party, rather than the nominally independent boards of directors of the corporations. Respondent argued that the "[directors] did exactly what the Party told them; they cooperated with the Party, and they served as . . . Board of Directors' members without independently exercising their judgment."

■ A contract purporting to delegate ultimate authority and control over a corporation from the board of directors to outside parties with no ownership interest in the corporation is void and unenforceable. (*Kennerson* v.

*Burbank Amusement Co.* (1953) 120 Cal.App.2d 157, 170-173 [260 P.2d 823]; *Smith* v. *California Thorn Cordage, Inc.* (1933) 129 Cal.App. 93, 98-99 [18 P.2d 393].) "Inasmuch as the directors [of a corporation] must exercise and maintain control over corporate affairs in good faith, they are prohibited from delegating such control and management to others, and any contract so providing is void. . . . [¶] California has recognized the rule that the board cannot delegate its function to govern. As long as the corporation exists, its affairs must be managed by the duly elected board. The board may grant authority to act, but it cannot delegate its function to govern. If it does so, the contract so providing is void. [Citations.]" (*Kennerson* v. *Burbank Amusement Co., supra*, 120 Cal.App.2d at pp. 172-173.)

 "Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person. [Citation.]" (*Tomaselli* v. *Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433].) Alter ego is utilized to prevent two parties with the *same* interest from inequitably using the corporate form to thwart a third party's rights; it is not designed to unite two separate entities with *opposing* interests for the benefit of the one claiming to control the other. In this case, there is no third party; respondent claims that it *itself* is identical to the corporations. Respondents have cited no case authority, and we have found none, in which rather than being used to reach behind the corporate form to attach liability to another individual or entity, the alter ego doctrine has been employed to establish a relationship of identity between the defendant corporation and the plaintiff itself, in order to allow the plaintiff to obtain for itself the assets of the corporation. To the contrary, our Supreme Court has stated that the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require. (*Mesler* v. *Bragg Management Co., supra*, 39 Cal.3d at p. 300.) Respondent cannot use the alter ego doctrine to "pierce the corporate veil" of a separate corporation which it claims it set up to conceal its property from the federal government and to circumvent the laws of the state concerning duties of corporate directors.

The case of *Most Worshipful Sons* v. *Sons etc. Lodge* (1958) 160 Cal.App.2d 560, 563-569 [325 P.2d 606], on which the trial court relied in applying the alter ego doctrine to this case, is factually distinguishable and inapposite. There, alter ego was used to reach behind a defendant corporation to a nominally separate corporation which it established in order to hold property wrongfully taken from the plaintiff third party. In our case, of course, there is no third party; respondent itself claims to have set up the appellant corporations for its *own* benefit, while treating them as legally separate from itself.

## DISPOSITION

The judgment in favor of the respondent Communist Party of the United States of America and against appellants 522 Valencia, Inc., Pacific Publishing Foundation, Inc., Carl Bloice, Esther Brown, Mary Idosidis, William Sorro, Sally Sweet and Lloyd Vandever, is reversed, and the trial court is directed to enter judgment in favor of all appellants.

The order awarding respondent its costs of suit against the individual appellants is reversed, and the respondent shall bear the costs of suit below and on appeal of all appellants.

Chin, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied June 30, 1995, and respondent's petition for review by the Supreme Court was denied September 13, 1995.