Filed 5/9/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARTHUR C. HIGGINS, as Executor, etc., | B265865 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. KC066345) |
| v. | |
| MARIA LUPE HIGGINS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dan Thomas Oki, Judge. Reversed and Remanded.

Law Office of Robert E. Knudsen and Robert E. Knudsen; Law Offices of Layne A. Bartholomew, Layne A. Bartholomew, for Plaintiff and Appellant.

Kasai Law Group, Wayne T. Kasai and Kristin E. Reynolds, for Defendant and Respondent.

———————————————

A wife agreed to hold funds in trust for her husband's elderly stepmother. After her husband's death, the wife changed the form of the accounts and used the funds for her own purposes. The stepmother died and her personal representative brought this action to impose a constructive trust on the funds. At the conclusion of the personal representative's case-in-chief, the trial court granted judgment in favor of the wife under Code of Civil Procedure section 631.8. The trial court found the husband committed no wrongdoing in transferring the funds to the accounts, and the trust designation on the accounts was revocable, so no constructive trust could be imposed on the funds. We hold that despite the form of the bank accounts, when clear and convincing evidence shows funds were transferred to an account owner to hold in an irrevocable trust for a third party beneficiary and the trustee repudiates the trust, a constructive trust may be imposed on the funds for the beneficiary's estate to prevent unjust enrichment. We reverse the judgment and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

### Estate Plan and Transfer of Assets

Maria Lopez Higgins (Maria) and her husband, Bartlett Higgins, prepared a thorough estate plan in 1994.[1] They established the Higgins Family Trust dated March 11, 1994 (the Family Trust), and placed real property on Sunset Boulevard into the trust, along with other assets. The trust provided for the settlors during their lifetimes. Upon the death of the second spouse, the trustee would distribute $10,000 to each surviving grandchild and $10,000 to Maria's niece. The primary beneficiaries of the remaining trust assets would be Bartlett's sons, who were Maria's stepsons: W. Clive Higgins, Arthur C. Higgins, James Higgins, and Karl Higgins. The trustee would divide the balance by allocating one share to each living son and one share to each deceased son with surviving issue.

Maria's will provided for her property at her death, including savings and checking accounts to be added to the Family Trust and administered under its terms. She nominated Bartlett to serve as her executor. If he was unwilling or unable to act as executor, she nominated Clive. If Clive was unwilling or unable to serve, she nominated

---

[1] Because several participants share the same last name, we refer to them individually by their first names or the names they were known by, as necessary for clarity.

Arthur. Maria and Bartlett executed powers of attorney as well.

Bartlett died the following year. Maria was authorized under the terms of the Family Trust to serve as the sole trustee after Bartlett's death, although she was required to serve with a co-trustee under certain circumstances to avoid taxes. The individuals nominated to serve as executor under her will were appointed as successor trustees under the Family Trust. Maria did not take actions as trustee in the name of the Family Trust, however. She continued to conduct transactions during her lifetime in her own name.

Maria leased the Sunset Boulevard property for $10,000 per month to a family business operated by Clive, Arthur, and Karl. After his father's death, Clive visited Maria regularly to assist with her finances. He helped her pay bills, collect rents, and deposit checks. Clive became the sole owner of the family business when Karl passed away in August 1999, and Arthur sold his shares to Clive after a dispute in December 1999. Clive had four sons of his own, including Michael Higgins and Mark Higgins, prior to his marriage to defendant and respondent Maria Lupe Higgins (Lupe). When Clive became the sole owner of the business, his son Michael took a management position to assist his father.

Maria executed a second power of attorney on March 20, 2007, appointing Clive and another individual to make joint decisions if she became disabled or incapacitated. She executed a new lease with Clive for the Sunset Boulevard

4

property, reducing the rent to $5,000 per month. On March 30, 2007, Maria reported complaints about her short-term memory to Dr. Nelson Sanchez. She was 91 years old and had a regular caregiver. In Dr. Sanchez's opinion, her cognitive dysfunction was more than normal memory loss and could progress into dementia. He prescribed a medication commonly used for dementia or Alzheimer's patients.

During six visits to Dr. Sanchez between May 2007 and June 2008, Maria was oriented, participated in interviews, and understood instructions. On August 25, 2008, however, Maria did not know the year or the president, which was a cognitive decline from the previous year. Maria's memory function further declined by March 16, 2009. Dr. Sanchez switched her medication to one typically prescribed for more severe dementia.

Maria owned checking and savings accounts for many years at Los Angeles National Bank. On May 4, 2009, Maria executed new signature cards adding Clive as a joint account holder to her checking and savings accounts. Maria's social security check was deposited directly into the checking account. In addition to the checking and savings accounts, Maria had two certificates of deposit.

By June 2010, Maria had full-time care. On September 30, 2010, Dr. Sanchez included dementia in Maria's diagnosis. Clive's health began to suffer in June 2011. His son Mark took him to Mexico for treatments. Maria's caregiver gave notice and Maria was placed in a nursing care

facility in February 2012. Clive was diagnosed with cancer at the end of February 2012. His health declined rapidly. In March 2012, he was placed under hospice care at home. On March 25, 2012, he was hospitalized for a few days.

When Clive returned from the hospital at the end of March, he could not walk or care for himself. He was completely dependent on Lupe and hospice. He was not capable of caring for Maria's finances. Clive and Lupe conducted all of their banking transactions through bank manager Juan Sandoval. At times, Sandoval came to Clive and Lupe's home to conduct transactions.

On March 28, 2012, Clive closed Maria's checking account. He transferred the balance of $113,889.75 into a new account by a check endorsed by Clive and Lupe "in trust for Maria Lopez." On the signature card for the new checking account, the account owners were listed as "William Clive Higgins [¶] Lupe Higgins [¶] ITF Maria Lopez Higgins." The boxes on the form for a joint account, trust under a separate agreement, Totten trust, or pay-on-death (POD) designation were not selected. Instead, "ITF: Maria Lopez Higgins" was typed in.

Clive withdrew $121,887.74 from Maria's savings account, closed the account, and deposited the funds in a new savings account which he opened on March 30, 2012. The account owners were listed as "William Clive Higgins [¶] Lupe Higgins [¶] ITF Maria Lopez Higgins." In the area to indicate the ownership of the account and the consumer purpose, "In Trust for Maria Lopez Higgins" was typed in.

6

That same day, Clive withdrew $100,420.92 from Maria's certificate of deposit number 104208447, and transferred the funds to a new certificate of deposit number 104211312. He also withdrew $99,983.47 from Maria's certificate of deposit number 104208465, resulting in early withdrawal penalties of $73.99, and transferred the funds to a new certificate of deposit number 104211314. On the signature cards for the new certificates of deposit, the owners were listed for both accounts as "William Clive Higgins [¶] Lupe Higgins [¶] ITF Maria Lopez Higgins." In the area for the form of ownership and consumer purpose, "In Trust for Maria Lopez Higgins" was typed in. The signature cards state the initial deposits were $100,000 and $100,375.84. A debit notice for $16.53 was issued for one account and a credit of $45.08 was issued for the other.

When Clive asked her to sign the bank documents, Lupe signed the signature cards at their home without asking questions. She did not have any discussions with Clive about the reasons for opening the accounts. Lupe understood the owners of the checking account to be Maria and Clive. She understood the savings account to be owned by "Clive, Lupe, everything on behalf of Maria." Lupe knew at the time she signed the signature cards, including the certificates of deposit, that the purpose for which she was opening accounts in trust for Maria was that everything was for Maria to take care of Maria.

Maria's social security checks, monthly rent of $5,000 from the Sunset Boulevard property, and checks from life

7

insurance companies and other entities made out to Maria were deposited into the checking account. Clive's son Mark helped Lupe pay Maria's bills by filling out checks for Lupe to sign.

In early May 2012, Clive died without a will. His estate included real property and the stock of the business. After Clive passed away, Mark helped Lupe every day. Lupe wanted Maria to move in with her, so Mark helped to move Maria from the nursing home to Lupe's house.

On June 12, 2012, Lupe met with Sandoval at the bank. She changed the ownership of the checking and savings accounts to list the account owner solely as "Maria Lupe Higgins." The new signature cards did not state that the funds were being held in trust for Maria. She had a new signature card prepared for the certificates of deposit listing the owner as "Maria Lupe Higgins." Under form of ownership and consumer purpose, a box was checked for an individual account. Nothing was stated about Maria's interest or the account being held in trust.

Mark moved Maria to his home while they looked for a new nursing home. Arthur was notified that his brother Clive had died, Arthur was the successor trustee under terms of the Family Trust, and he needed to take care of Maria. He asked for a copy of the Family Trust.

A new nursing home was located by June 18, 2012. Lupe signed checks to pay for the nursing home with a notation on the checks that she was Maria's caregiver. Maria's social security checks continued to be deposited

8

directly into the checking account.  The June 2012 statement for the savings account reflects multiple deposits of checks made out to Maria.

Maria died in August 2012.  Her funeral expenses were paid from the checking account that was now in Lupe's name.  Lupe signed blank checks, which she gave to Mark to fill in with the information for the funeral expenses.

Arthur established a bank account for the Family Trust and obtained a taxpayer identification number.  In September 2012, Mark provided Arthur with a copy of the lease for the Sunset Boulevard property.

Lupe paid $10,000 to each of Bartlett and Maria's eight grandchildren from the checking account that was now in Lupe's name.  Mark asked Lupe to distribute $10,000 to Maria's niece, but Lupe refused because she was not a grandchild.

At the end of September, Lupe changed the name of the owner on the savings and checking accounts from "Maria Lupe Higgins" to "Lupe Higgins."  Lupe wired $5,000 to her mother in Mexico and gave $2,000 to her sister from the checking account.  She paid her attorney from the account.  A check was made out to cash in the amount of $9,706.33 to close the account.

In April 2013, the savings account had a balance of $136,572.02.  Lupe withdrew $100,017.26 from certificate of deposit number 104211314 on April 8, 2013, closed it, and deposited the funds in the savings account.  She closed the other certificate of deposit, valued at a little more than

$100,000, and deposited it in the savings account as well. The money in the savings account represented everything left after Maria's bills had been paid and the distributions had been made to Bartlett's grandchildren that were described in the Family Trust. All of Lupe's transactions with the bank, while Clive was alive and after his death, were conducted through Sandoval.

Lupe arranged wire transfers of $120,000 and $100,000 to open new accounts for herself. In July 2013, she wired $5,000 to her brother from the savings account. She sent another wire transfer to her brother. On August 15, 2013, she withdrew $50,000 and used it for her own expenses. She used another $40,000 to support herself. Approximately $22,000 remained in the savings account at the time of trial.

## Action for Constructive Trust

On September 23, 2013, plaintiff and appellant Arthur Higgins, as executor of Maria's estate and successor trustee of the Family Trust, filed the complaint in the instant action against Lupe to impose a constructive trust on the funds in the accounts. The complaint alleged that Clive and Lupe obtained their claim to the funds by reason of fraudulent or otherwise wrongful conduct, including an agreement that the funds would be used solely for Maria's benefit, and Lupe unduly influenced Clive to transfer the funds to her to deprive Maria and the trust of the funds. A bench trial began on May 19, 2015.

Arthur's first witness was Ben Tsugawa, Vice President at Royal Business Bank, which purchased Los Angeles National Bank. Tsugawa testified that the bank views the designation "ITF" like a Totten trust. Clive and Lupe were the owners of the account, while Maria was the beneficiary if Clive and Lupe both passed away. Maria had no present interest in the account and was not an owner or a signatory. The endorsement on the check depositing funds into the new account typically reflects the vesting on the new account. Sandoval left the bank's employment two months before the trial and it was not the bank's practice to provide contact information for former employees.

Psychologist Robert Sawicky testified that Maria was dependent upon Clive to make decisions for her in 2009 and was susceptible to undue influence. Dr. Sanchez testified as well. He opined that Maria was not capable of making decisions about properties or estate planning documents, or understanding the differences between financial accounts on March 16, 2009. By September 2010, her symptoms had progressed to the stage that he could conclusively diagnose dementia.

Clive's sons were witnesses at trial. Mark testified that he and Lupe found a copy of the Family Trust at Maria's house. When Lupe learned Arthur was responsible for the Family Trust and would serve as executor when Maria died, she said she would not help Mark with anything. She asked Mark to drive her to the bank to talk to Sandoval. Mark waited with the tellers while Lupe conducted her

11

business with Sandoval, then he took her home. Lupe also wanted Maria to move out of her home. Mark and his wife took Maria into their home to give Lupe a break while they tried to find a nursing home for Maria. Lupe complained about the cost of the facility they located, but Mark reminded her that the money belonged to Maria, so it should go to her needs, and Lupe signed the checks.

Michael testified that when Clive returned from the hospital at the end of March, he was not in any condition to go to the bank, conduct banking transactions, or make financial decisions.

Lupe testified as well. She was not aware that Maria was suffering from any chronic physical pain or dementia. Maria did not experience any health problems while she was living with Lupe. At her deposition, Lupe stated that she never had a bank account where she held funds in trust for Maria or funds that belonged to Maria, but she was a beneficiary of an account with funds that belonged to Maria. At trial, however, she readily admitted that she signed documents to open accounts held in trust for Maria and she knew the funds in the accounts were intended for Maria.

Lupe referred to the checking account several times during her testimony as "Maria's account." Even after she changed the ownership of the account to be in her name only and removed the "in trust for" designation, everything in the account was for Maria. After Maria's death, Lupe wrote checks from the account to Maria's grandchildren because it

12

was Maria's money.  The funds that she gave to the grandchildren were not a gift from Lupe.

Lupe believed the funds in the accounts transferred to her when Maria died.  She also believed she was entitled to keep money electronically deposited into the accounts for Maria after her death, such as a deposit from Guggenheim Life Insurance on September 20, 2012, because Maria was no longer alive.  Clive and Lupe were the owners named on the account, and Clive was no longer alive, so it was logical that the funds in the account were hers.  She explained that Maria was not around anymore, Clive was not around anymore, and the account belonged to her.

At the conclusion of Arthur's evidence, Lupe brought a motion for judgment pursuant to Code of Civil Procedure section 631.8.  She argued that the complaint sought a constructive trust based on undue influence or fraud, but there was no evidence of undue influence or fraud by Lupe with regard to Maria.  Any cause of action based on undue influence or fraud by Clive needed to be brought against him, and the statute of limitations had passed.  Clive had the legal right to withdraw money from the joint accounts he had with Maria.

Arthur responded that a constructive should be imposed on the funds in this case based on evidence of undue influence, lack of capacity, and violation of a trust.  He argued that even unintentionally, the joint bank accounts between Maria and Clive were a product of Clive's undue influence.  When Clive opened new accounts with Lupe, he

13

did not intend to make a gift of Maria's money to Lupe. The parties to an account can agree that the funds are owned differently as between the parties, which is what the evidence showed in this case. Clive made the funds accessible to Lupe with the understanding, and Lupe's acknowledgement, that the funds belonged to Maria. Lupe's use of funds that she knew belonged to someone else was wrongful.

The trial court found Clive was a loving son-in-law and father who committed no wrongful act. He did not exercise any undue influence and sought only to assist Maria. Once Clive was added to Maria's accounts as a joint account holder, he had a legal right to do as he pleased with the funds. The bank signature cards for the new accounts clearly indicated his intent to hold the funds in trust for Maria. Under the agreement with the bank, however, the funds only went to the beneficiary after the death of the account owners. If there was a wrongful act by Clive, any action against him or his estate had to be brought within a year of his death. Clive made Lupe a joint tenant, and after Clive passed away, as the surviving joint tenant, she had the right to do as she pleased with the funds in the accounts. The trial court stated Lupe had a clear moral obligation to return the money to the Family Trust, but the court could not find a legal obligation. The court apologized to the Higgins family for the court's inability to restore the funds. The court granted judgment in favor of Lupe.

Judgment was entered in favor of Lupe on June 16, 2015.  Arthur filed a timely notice of appeal.

## DISCUSSION

### Standard of Review

If the trial court determines at the conclusion of the plaintiff's case-in-chief that the plaintiff has failed to meet the burden of proof, Code of Civil Procedure section 631.8 allows the court to forgo the need for the defendant to present evidence.  (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549.)  "The substantial evidence standard of review applies to judgment given under Code of Civil Procedure section 631.8; the trial court's grant of the motion will not be reversed if its findings are supported by substantial evidence.  [Citation.]  Because section 631.8 authorizes the trial court to weigh evidence and make findings, the court may refuse to believe witnesses and draw conclusions at odds with expert opinion.  [Citation.]"  (*Id.* at pp. 549–550.)

### General Principles of Constructive Trust

Arthur contends undisputed evidence in this case established all of the conditions necessary to impose a constructive trust.  We agree.

An action to impose a constructive trust is a suit in equity to compel a person holding property wrongfully to

transfer the property interest to the person to whom it rightfully belongs. (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990 (*Communist Party*); Bogert et al., The Law of Trusts and Trustees (3d ed. 2009) § 471, p. 2; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 840, p. 255.)

The general principles for imposition of a constructive trust are set forth in Civil Code sections 2223 and 2224. (*Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237–238 (*Martin*).) Civil Code section 2223 states, "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Civil Code section 2224 provides, "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

Three conditions must be shown to impose a constructive trust: (1) a specific, identifiable property interest, (2) the plaintiff's right to the property interest, and (3) the defendant's acquisition or detention of the property interest by some wrongful act. (*Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116 (*Calistoga*); *Communist Party, supra,* 35 Cal.App.4th at p. 990.)

An action to impose a constructive trust is subject to the statute of limitations that governs the underlying substantive right. (*Day v. Greene* (1963) 59 Cal.2d 404, 411

16

(*Greene*); *Davies v. Krasna* (1975) 14 Cal.3d 502, 515–516.)[2] "This section has been applied to diverse factual situations where fairness and justice dictated recovery but the actionable facts did not fit into the more readily recognizable modes." (*Santa Clarita Water Co. v. Lyons* (1984) 161 Cal.App.3d 450, 460.) "Thus, it has been pointed out that 'a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.' [Citations.]" (*Martin*, *supra*, 145 Cal.App.3d at p. 238.)

---

[2] To the extent *Glue-Fold, Inc. v. Slautterback Corp.* (2000) 82 Cal.App.4th 1018, 1023, fn.3, suggests no cause of action for constructive trust exists, the suggestion would be inconsistent with the weight of authority. (See, e.g., *Flores v. Arroyo* (1961) 56 Cal.2d 492, 494–495 [complaint stated a cause of action to declare a constructive trust]; *Greene*, *supra*, 59 Cal.2d at p. 411 [statute of limitations applicable to action to impose a constructive trust is determined by the nature of the underlying substantive right, not the form of the action or the remedy sought]; *Olson v. Toy* (1996) 46 Cal.App.4th 818, 823 [claim for constructive trust is effectively an action for possession of property].) The sole authority cited for the proposition in *Glue-Fold* is 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 796, p. 252, which does not stand for the proposition cited, and in fact, discusses a cause of action for constructive trust.

## Violation of Promise to Hold Funds in Trust

A constructive trust may be imposed in this case based on Lupe's repudiation of an express voluntary trust in which she agreed to hold funds in trust for Maria. Clive transferred funds to trust accounts with Lupe's agreement that the funds belonged to Maria and would be held in trust for Maria. After Clive's death, Lupe removed Maria's name from the accounts and used the funds for her own purposes, repudiating her promise to hold them in trust on Maria's behalf. This evidence was sufficient to impose a constructive trust on the funds to prevent unjust enrichment.

Multiple-party bank accounts, including joint accounts and Totten trusts,[3] are governed by the Probate Code. (Prob. Code, §§ 5100, 5132.) A Totten trust is a "tentative trust," created when a depositor opens a bank account "in trust for" another person, but reserves the power to withdraw funds during the depositor's lifetime. (*Estate of Allen* (1993) 12 Cal.App.4th 1762, 1766; *Estate of Collins* (1978) 84 Cal.App.3d 928, 932 (*Collins*); *Estate of Fisher* (1988) 198 Cal.App.3d 418, 424 (*Fisher*).) If the trust is not revoked

---

[3] Probate Code section 80 defines "Totten trust account" as an account in the name of one or more parties as trustee for one or more beneficiaries where the relationship is established by the form of the account and the deposit agreement with the financial institution and there is no subject of the trust other than the sums on deposit in the account.

before the depositor's death, any balance in the account is payable to the beneficiary. (*Fisher*, *supra*, at p. 424.) "In a real sense a tentative or Totten trust is not a trust at all but is a recognized exception to the law of testamentary disposition and as such obviates the necessity for compliance with the requisite statutory elements of executing a will." (*Collins*, *supra*, at p. 932.)

While all parties are living, an account belongs to the parties who have a present right to payment, in proportion to their contributions, unless there is clear and convincing evidence of a different intent. (Prob. Code, §§ 5136, subd. (a), 5301, subd.(a).)[4] "In the case of a Totten trust account,

---

[4] At the time the accounts were opened in this case, Probate Code section 5301 provided: "(a) An account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent. [¶] (b) In the case of a P.O.D. account, the P.O.D. payee has no rights to the sums on deposit during the lifetime of any party, unless there is clear and convincing evidence of a different intent. [¶] (c) In the case of a Totten trust account, the beneficiary has no rights to the sums on deposit during the lifetime of any party, unless there is clear and convincing evidence of a different intent. If there is an irrevocable trust, the account belongs beneficially to the beneficiary."

Probate Code section 5301 was amended, effective January 1, 2013, to add provisions governing excess withdrawals. Probate Code section 5301 currently provides:

the beneficiary has no rights to the sums on deposit during the lifetime of any party, unless there is clear and convincing

---

"(a) An account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each, unless there is clear and convincing evidence of a different intent.  [¶]  (b) If a party makes an excess withdrawal from an account, the other parties to the account shall have an ownership interest in the excess withdrawal in proportion to the net contributions of each to the amount on deposit in the account immediately following the excess withdrawal, unless there is clear and convincing evidence of a contrary agreement between the parties.  [¶]  (c) Only a living party, or a conservator, guardian, or agent acting on behalf of a living party, shall be permitted to make a claim to recover the living party's ownership interest in an excess withdrawal, pursuant to subdivision (b).  A court may, at its discretion, and in the interest of justice, reduce any recovery under this section to reflect funds withdrawn and applied for the benefit of the claiming party.  [¶]  (d) In the case of a P.O.D. account, the P.O.D. payee has no rights to the sums on deposit during the lifetime of any party, unless there is clear and convincing evidence of a different intent.  [¶]  (e) In the case of a Totten trust account, the beneficiary has no rights to the sums on deposit during the lifetime of any party, unless there is clear and convincing evidence of a different intent.  If there is an irrevocable trust, the account belongs beneficially to the beneficiary.  [¶]  (f) For purposes of this section, 'excess withdrawal' means the amount of a party's withdrawal that exceeds that party's net contribution on deposit in the account immediately preceding the withdrawal."

20

evidence of a different intent.  If there is an irrevocable trust, the account belongs beneficially to the beneficiary." (Prob. Code, § 5301, subd. (e).)  A finding under the clear and convincing evidence test requires evidence clear enough to leave no substantial doubt and strong enough that every reasonable person would agree.  (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 552.)

In this case, there was clear and convincing evidence that Clive and Lupe intended to create irrevocable trust accounts in which Maria had a present beneficial interest in the funds on deposit, not Totten trust accounts.  "A trust is a fiduciary relationship with respect to property in which the person holding legal title to the property—the trustee—has an equitable obligation to manage the property for the benefit of another—the beneficiary."  (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1133–1134, italics omitted.) "To be valid, a trust, whether oral or written, must contain three elements:  a trust res, the manifestation of a trust intent, and a proper trust purpose.  ([Prob. Code,] §§ 15201, 15202, 15203.)"  (*Estate of Gardner* (2010) 187 Cal.App.4th 543, 552.)  "It is well settled that no particular language or terminology is necessary to create a trust; nor need the word 'trust' or 'trustee' be used; nor need all the conditions of the trust be expressed in a single paper; nor need a trust in personal property be in writing."  (*Weiner v. Mullaney* (1943) 59 Cal.App.2d 620, 631.)  Probate Code section 15200 sets forth several methods for creating a trust, including "[a] transfer of property by the owner during the owner's lifetime

21

to another person as trustee." (Prob. Code, § 15200, subd. (b); *Presta v. Tepper* (2009) 179 Cal.App.4th 909, 914 (*Presta*).) "'A trust is any arrangement which exists whereby property is transferred with an intention that it be held and administered by the transferee (trustee) for the benefit of another . . . .' [Citations.]" (*Presta, supra*, at p. 913.)

Clive and Lupe intended the trust in this case to be irrevocable, unlike a Totten trust that is revocable at will during the owner's lifetime. Clive transferred Maria's money into the accounts. Maria's social security income and other payments owed to Maria continued to be deposited directly into the accounts. The owner of a Totten trust generally deposits his or her own money and retains the right to withdraw funds for any purpose, but Clive and Lupe did not deposit their own funds into these accounts. Although Lupe did not have any conversation with Clive about the reasons for opening the accounts, it is clear from her actions and testimony that she agreed to hold the funds in trust for Maria and use them for Maria's needs. Lupe signed signature cards that stated the accounts were in trust for Maria. She testified that the funds in the accounts belonged to Maria, and she believed everything in the accounts was for Maria. She referred to the funds several times during her testimony as Maria's money. Lupe used the money in the accounts for Maria's needs, and after Maria's death, for the expenses of Maria's funeral and specific bequests set forth in Maria's estate plan. The evidence was clear and convincing that Clive and Lupe

22

agreed the beneficial ownership of the trust accounts belonged to Maria, unlike Totten trusts in which the beneficiary has no present interest during the owner's lifetime.

Clive and Lupe held the legal title to the accounts as co-trustees, while Maria held the beneficial title. As a co-trustee, Clive's death had no effect on Maria's beneficial ownership of the accounts. In cases other than joint accounts, Totten trusts and P.O.D. accounts, "the death of any party to a multiparty account has no effect on beneficial ownership of the account other than to transfer the rights of the decedent as part of the decedent's estate." (Prob. Code, § 5302, subd. (d).)[5] There was clear and convincing evidence

_____

[5] Probate Code section 5302 governs funds in a multiple-party account on the death of one of the parties, stating in pertinent part: "(a) Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent . . . . [¶] (b) If the account is a P.O.D. account: [¶] (1) On death of one of two or more parties, the rights to any sums remaining on deposit are governed by subdivision (a). [¶] . . . [¶] (c) If the account is a Totten trust account: (1) On death of one of two or more trustees, the rights to any sums remaining on deposit are governed by subdivision (a). [¶] . . . [¶] (d) In other cases, the death of any party to a multiparty account has no effect on beneficial ownership of the account other than to transfer the rights of the decedent as part of the decedent's estate. [¶] (e) A right of

that Lupe continued to hold the funds in trust for Maria after Clive's death, as the parties to the account intended, and Maria continued to own the beneficial interest in the accounts after Clive's death.

Lupe repudiated the trust by removing Maria's name from the accounts after Clive's death, and she breached her fiduciary duty by using the funds for her own purposes. "A cause of action in *constructive* trust may be based on a breach of fiduciary duty by a trustee of an express trust." (*Ehret v. Ichioka* (1967) 247 Cal.App.2d 637, 643.) The statute of limitations begins to run when the trustee of an express voluntary trust repudiates the trust. (*Chard v. O'Connell* (1941) 48 Cal.App.2d 475, 480.) If the beneficiary does not receive written accountings, the action against the trustee for breach of trust must be filed within three years of discovery of the claim. (Prob. Code, § 16460, subd. (a)(2); *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1123.) Arthur's complaint against Lupe was filed on September 23, 2013, well within the three-year statute of limitations for a constructive trust action based on breach of trust, whether Lupe's repudiation of the trust occurred as early as June 2012 when she removed Maria's

survivorship arising from the express terms of the account or under this section, a beneficiary designation in a Totten trust account, or a P.O.D. payee designation, cannot be changed by will." The rights of survivorship set forth in section 5302 "are determined by the form of the account at the death of a party." (Prob. Code, § 5303, subd. (a).)

24

name from the accounts, or later when she transferred money for her own purposes.

Even if the express trust was found to be unenforceable, a constructive trust may be imposed on the funds transferred to Lupe based on her promise to hold them in trust for Maria in order to prevent unjust enrichment. If a grantor conveys property to another in reliance on an oral promise to hold the property in trust for the grantor or a third person, and the grantee subsequently repudiates the promise and denies the trust, a constructive trust may be imposed on the property in order to prevent unjust enrichment. (*Orella v. Johnson* (1952) 38 Cal.2d 693, 696–698 [oral promise to hold real property in trust may be unenforceable under the statute of frauds, but a constructive trust may be imposed on the property to prevent unjust enrichment].)

Although Lupe changed the form of the accounts in June 2012, she did not have any beneficial interest in them. When Maria died, her beneficial interest in the accounts passed to her estate. Maria's will provided for her property, including savings and checking accounts, to be administered under the Family Trust. There is no evidence that Clive intended to give the funds to Lupe or told her that the funds in the account would belong to her after Maria's death. Lupe was not named as a beneficiary of the accounts or Maria's estate plan. Lupe testified that she kept the funds because her name was on the account and it was logical that the funds belonged to her as the only surviving account owner.

After Maria's death, however, she paid funeral expenses from the accounts and made distributions in accordance with the provisions of the Family Trust, so there is evidence that she knew Maria's ownership interest passed to her estate after her death.  Lupe held the funds in trust for Maria's estate after her death, and Arthur, as the executor of the estate and the trustee of the Family Trust, was entitled to receive the funds.

We conclude Lupe held the funds in the accounts in trust for Maria, and her repudiation of the trust by removing Maria's name from the accounts and using the funds for her own purposes was a wrongful act supporting the imposition of a constructive trust.  We do not need to decide whether there was evidence of additional wrongful acts that would support a constructive trust, such as actual fraud in receiving payments intended for Maria, or a simple mistake of law in retaining funds after Maria's death (see generally *Decorative Carpets, Inc. v. State Board of Equalization* (1962) 58 Cal.2d 252, 254 [constructive trust imposed on funds collected due to mistake of law]).  At this stage of the proceedings, the evidence shows Arthur is entitled to a constructive trust as a matter of law.  On remand, however, Lupe will be entitled to present evidence, and the trial court will make a final determination of the issues.

## DISPOSITION

The judgment is reversed and remanded for further proceedings. Appellant Arthur C. Higgins, as executor of the estate of Maria Lopez Higgins and successor trustee of the Higgins Family Trust dated March 11, 1994, is awarded his costs on appeal.


KRIEGLER, Acting P.J.


We concur:


BAKER, J.


KIN, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.