Filed 1/30/23  Sayegh v. Citizens Business Bank CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| HANI SAYEGH et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITIZENS BUSINESS BANK,<br><br>    Defendant and Respondent. | D080013<br><br>(Super. Ct. No. CIVDS1929734) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Affirmed.

Law Office of Gary Kurtz and Gary A. Kurtz, for Plaintiffs and Appellants.

Best Best & Krieger, Richard T. Egger and Avi W. Rutschman, for Defendant and Respondent.

INTRODUCTION

This appeal arises from Hani and Frances Sayeghs' acquisition of a foreclosed commercial property (the Koala Property) subject to a lis pendens from an intermediate owner, and loss of that property when litigation arising

from the foreclosure was resolved for the lis pendens claimant. The Sayeghs brought this action against the foreclosing lender, Citizens Business Bank (CBB), for negligence and financial elder abuse. As we shall explain, the Sayeghs cannot establish either cause of action against CBB, and we affirm the judgment of dismissal entered upon the trial court's grant of CBB's demurrer.

CBB had foreclosed on the Koala Property in 2014, when commercial borrowers, the Dunagans, failed to pay loans secured by deeds of trust. The Dunagans sued CBB and recorded a lis pendens later that year. In 2016, Western States Development and Construction, Inc. (Western) bought the property from CBB. The Sayeghs bought the property from Western the same year, both with actual knowledge there was a foreclosure dispute and constructive knowledge of the lis pendens. In 2019, the Dunagans prevailed against CBB, and the court in that action ordered the Koala Property restored to the Dunagans and the trust deeds restored to CBB. CBB settled with the Dunagans and agreed not to foreclose on the deeds.

The Sayeghs then sued CBB for negligence and financial elder abuse. The trial court sustained CBB's demurrer to the operative complaint without leave to amend. On negligence, the court ruled CBB had no duty of care to the Sayeghs, and they could not establish causation because they purchased subject to a lis pendens. On elder abuse, the court ruled there was no taking of property, because a court (not CBB) restored the property interests to their pre-foreclosure status and the Sayeghs did not establish any equitable or beneficial interest in the restored deeds.

On appeal from the judgment of dismissal, the Sayeghs contend CBB did owe them a duty of care and they did have, or could establish, an

2

equitable and beneficial interest in the restored trust deeds, among other arguments.  We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Notice Of Lis Pendens*

For context, we begin by describing what a lis pendens is, and how it works in California.  " 'A lis pendens is a recorded document giving constructive notice that an action has been filed affecting title or right to possession of the real property described in the notice.' " (*Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 647.)  "Under the common law doctrine of lis pendens a prospective purchaser is on constructive notice of any litigation raising a claim to real property . . . anywhere in the state. . . .  Lis pendens statutes were enacted to soften this doctrine by requiring that a recorded notice be filed in the county where the real property is located." (*The Formula Inc. v. Superior Court* (2008) 168 Cal.App.4th 1455, 1461.)

"California's notice of pendency of action, or lis pendens, scheme is codified in Code of Civil Procedure section 405.1 et seq." (*Park 100 Investment Group II, LLC v. Ryan* (2009) 180 Cal.App.4th 795, 808.)  Under this system, a " '[c]laimant' " is a "party to an action who asserts a real property claim and records a notice of the pendency of the action."  (Code Civ. Proc., § 405.1.)  "From the time of recording the notice of pendency of action," a "purchaser . . . of the real property described in the notice shall be deemed to have constructive notice of the pendency of the noticed action as it relates to the real property[.]"  (Code Civ. Proc., § 405.24.)  The "rights and interest of the claimant in the property, as ultimately determined in the pending noticed action, shall relate back to the date of the recording of the notice." (*Ibid*.)  Accordingly, " 'any judgment later obtained in the action relates back

3

to the filing of the lis pendens.' " (*Mira Overseas Consulting Ltd. v. Muse Family Enterprises, Ltd.* (2015) 237 Cal.App.4th 378, 383.)

A "lis pendens clouds title until the litigation is resolved or the lis pendens is expunged, and any party acquiring an interest in the property after the action is filed will be bound by the judgment." (*Slintak v. Buckeye Retirement Co., L.L.C., Ltd.* (2006) 139 Cal.App.4th 575, 586–587 (*Slintak*); see *Deutsche Bank National Trust Co. v. McGurk* (2012) 206 Cal.App.4th 201, 214 (*Deutsche Bank*) ["[I]f a third party obtains a partial assignment from a . . . defendant while the action is pending, and the . . . plaintiff ultimately wins . . . , the third party's assignment would be invalid, as the . . . defendant had no interest to assign as of the date of the complaint."].)

## II.

*The Sayeghs Purchase, and Lose, Property Subject to a Lis Pendens*[1]

A.    *CBB's Predecessor Forecloses, and the Lis Pendens Is Recorded*

The Koala Property is commercial property on Koala Road, in Adelanto, California. Members of the Dunagan family (the Dunagans) purchased the property in 1993.

In February 2006, the Dunagans executed a promissory note and business loan agreement for $570,000 with American Security Bank (ASB), secured by a deed of trust on the Koala Property. In April 2011, the Dunagans executed another promissory note with ASB for $94,471.68, secured by another deed of trust on the Koala Property. The Dunagans and

---

[1]    Because this appeal arises from a judgment of dismissal after demurrer, we take the relevant factual background from the operative third amended complaint (TAC), the attached documents, and judicially noticed materials. As we later discuss, if there are inconsistencies, we rely on the documents and noticed materials. (See *Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400 (*Hoffman*).)

4

ASB had other loans, too. By 2012, ASB believed the Dunagans had failed to make required payments, and demanded payment of certain loans, including those secured by the Koala Property. In October 2013, ASB recorded notices of default.

In February 2014, ASB caused the Koala Property to be sold in a trustee's sale, and purchased the property. The trustee's deed upon sale was recorded in March 2014. CBB acquired ASB in May 2014.

In June 2014, the Dunagans sued ASB in San Bernardino Superior Court (Dunagan Action).[2] Their operative pleading had "two causes of action for breach of written contract, two causes of action for declaratory relief, and causes of action to set aside trustee's deed, cancelation of instruments[,] and intentional infliction of emotional distress[.]" The Dunagans recorded a notice of lis pendens in August 2014.

B.     *CBB Sells to Western*

In January 2016, Western offered to buy the Koala Property for $650,000 in cash, which CBB accepted. Western and CBB extended escrow multiple times. The grant deed was recorded on April 8, 2016.

C.     *Western Sells to the Sayeghs*

On April 18, 2016, Western signed a letter of intent with Christopher Goodman to purchase the Koala Property, with escrow to close by April 20. Goodman was unable to complete the transaction, but told Katherine Hall, chief executive officer of Western, that the Sayeghs had funds to purchase the property. Hani Sayegh "had a phone call with [Hall] . . . prior to closing the deal for the Koala Property," and she "informed the Sayeghs there was

---

2     *Edward Dunagan, et al. v. American Security Bank, et al.*, San Bernardino Superior Court No. CIVDS1408267.

5

nothing to worry about regarding the Dunagan[s'] litigation, as the [CBB] foreclosure on the Koala Property was a 'clean foreclosure.' "

On April 22, 2016, the Sayeghs purchased the Koala Property from Western, for $850,000 in cash. The grant deed was recorded on April 26, 2016.[3]

The Sayeghs spent over $1,000,000 on improvements to the Koala Property. They also established long-term leases with businesses for use of the property.

D.    *The Dunagans Prevail and the Court Restores Their Title*

In February 2019, the trial court in the Dunagan Action entered judgment for the Dunagans.[4] The court's statement of decision explained CBB's predecessor, ASB, "wrongfully exercis[ed] its power of sale when it foreclosed" on the Koala Property. The judgment declared the 2014 trustee's deed upon sale void and cancelled; restored title to the Dunagans, subject to the 2006 and 2011 trust deeds; and awarded $1,080,996 to the Dunagans from CBB.

The Dunagans and CBB engaged in mediation while the Dunagan action was on appeal. Their settlement agreement stated CBB would pay the Dunagans $895,000 for a release of all claims. The TAC alleged ASB's insurance carrier was the source of this payment. The agreement also stated

---

[3]    The Sayeghs contend "a double escrow was opened whereby the Sayeghs provided all the money for both transactions, i.e., the sale from CBB to [Western], then the sale from [Western] to the Sayeghs." This "double escrow" allegation is not in the TAC, and we do not consider allegations from prior complaints. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884 [an " 'amended pleading supplants all prior complaints' " and " 'alone will be considered by the reviewing court' "].)

[4]    The trial court here took judicial notice of the judgment and statement of decision in the Dunagan Action.

6

CBB would "cooperate with [the Dunagans] regarding transfer of title," and would "not seek to foreclose on the [p]roperty under either of the deeds of trust which were reinstated by the [j]udgment." The Sayeghs were not a party to the Dunagan Action. They attended the mediation, but were "isolated in a separate room" and "not given any opportunity to participate . . . in a substantive way."

In September 2019, the Dunagans filed an unlawful detainer action against the Sayeghs and their tenants in San Bernardino Superior Court. The TAC does not address the outcome of that action.

In September 2020, CBB recorded a "Substitution of Trustee and Deed of Full Reconveyance" (some capitalization omitted), as to each trust deed, which stated in pertinent part: "Beneficiary hereby appoints [CBB] . . . as successor trustee under the above Deed of Trust, and the undersigned does hereby RECONVEY WITHOUT WARRANTY, TO THE PERSON OR PERSONS LEGALLY ENTITLED THERETO, all the estate now held by it under said Deed of Trust."

## III.

### *The Sayeghs Sue CBB*

A.   *Operative Third Amended Complaint*

In October 2019, the Sayeghs sued CBB for negligence and financial elder abuse, among other claims. After multiple demurrers by CBB, the Sayeghs filed the operative TAC in January 2021. We focus on the allegations pertinent to their arguments on appeal.[5]

---

5    The Sayeghs also sued the Dunagans, Western, and Hall. None of those claims are at issue here.

7

The Sayeghs alleged CBB "was negligent when it wrongfully foreclosed on the Koala Property as evidenced by the judgment in the [Dunagan Action]." They asserted CBB "knew all subsequent owners would rely on the validity of the foreclosure process." They also asserted CBB was aware Western lacked "the funds to purchase the property" and would "immediately transfer" it to a third party. The Sayeghs further alleged CBB's "negligence was a substantial factor in causing [them] harm, because but for the wrongful foreclosure, [they] would not have purchased the Koala Property for $850,000 and would not have made subsequent investments in excess of $1,000,000," and that they suffered damages "[a]s a proximate result of [CBB's] negligence."

On their claim for financial elder abuse, the Sayeghs alleged their "payment of the $850,000 purchase price for the Koala Property and the execution of a purchase and sale agreement invested them with a 'beneficial interest' in the two Trust Deeds secured against the [p]roperty." They alleged CBB "wrongfully reinstated" and acquired the trust deeds in the Dunagan Action settlement agreement (citing the language stating CBB would not foreclose on the trust deeds); then "wrongfully kept" the deeds; and then "gave away [their] property" when it reconveyed them. The Sayeghs were over 65 years old at all relevant times.

B.    *CBB's Demurrer*

CBB demurred to the TAC. On negligence, CBB argued the Sayeghs "had nothing to do with [the] 2014 foreclosure" and CBB, as a foreclosing lender, had no duty of care to subsequent purchasers. CBB also argued the Sayeghs caused their own damage, because they chose to buy and improve the Koala Property despite the lis pendens, and any damages were the "result of their own . . . wager" that the Dunagan Action "would turn out well" for

8

them. On elder abuse, CBB argued the trial court, not CBB, reinstated the trust deeds, and the TAC did not show any wrongful use of the deeds by CBB.

In opposition, the Sayeghs argued as to negligence that, although CBB claimed it had "no duty to any subsequent buyer," there can be a duty of care to third parties and the TAC "detail[ed] a plan between CBB and [Western]" to sell the Koala Property to the Sayeghs, in light of Western's financial situation. The Sayeghs also argued the lis pendens did not excuse CBB's misconduct. On elder abuse, the Sayeghs argued they became beneficial owners of the trust deeds when the Dunagan foreclosure was vacated, and maintained CBB wrongfully took and retained them.

C.    *The Trial Court's Ruling*

In March 2021, the trial court sustained CBB's demurrer without leave to amend.

For negligence, the trial court agreed with CBB that it owed the Sayeghs no duty of care. The court began by explaining certain duty principles, including that a trustee's duties in conducting a nonjudicial foreclosure sale "run[ ] to the beneficiary, trustor, and participants in the sale, including prospective bidders," and that a property seller has duties of disclosure. The court found the Sayeghs were not involved in the foreclosure sale, and did not directly purchase the property from CBB. The court acknowledged the Sayeghs alleged CBB knew Western was in "serious financial straits" and "anxious to find" a buyer, but stated the allegation was based on belief, rather than facts, and, regardless, there were no allegations CBB was aware Western was "in negotiations with [the Sayeghs] for them to acquire the Koala Property[.]"

Turning to causation, the trial court found the Sayeghs admitted that, before they bought the Koala Property, "Hall disclosed [the Dunagans']

9

litigation against [CBB]," and allegedly told Hani Sayegh that "the foreclosure was clean." The court determined the Sayeghs' damages were the "risk [they] took when [they] purchased the [Koala] Property knowing it was the subject of litigation."

On financial elder abuse, the trial court found CBB "did not restore the Trust Deeds," but, rather, "[i]t was the [Dunagan Action] judgment that restored the state of the parties' interest in the property to pre-foreclosure interests." The court also rejected the Sayeghs' asserted equitable interest in the trust deeds, stating "nothing is offered to support entitlement" to such interest, "merely because [the Sayeghs] purchased the legal title in the [Koala] Property while it was the subject of litigation addressing the legality of the trustee's sale."

The trial court entered a judgment of dismissal, and the Sayeghs timely appealed.

## DISCUSSION

The Sayeghs contend they can establish negligence, because CBB was already found negligent in the Dunagan Action, CBB had a duty of care to the Sayeghs, and the lis pendens was no barrier to damages. We reject their arguments regarding the Dunagan Action and duty of care, and so we do not reach causation. The Sayeghs also contend they can establish financial elder abuse, because CBB took the restored trust deeds after the Dunagan Action despite the Sayeghs' beneficial interest in them. We reject this argument as well.

### I.

### *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to

state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162 (*Novartis*).) And if it does, we ask whether that complaint nevertheless discloses some defense or bar to recovery. (See *Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.) " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).) We "consider the complaint's exhibits" as well. (*Hoffman, supra,* 179 Cal.App.4th at p. 400.)

Although we accept as true all properly pled facts, "[u]nder the doctrine of truthful pleading, the courts 'will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed.' " (*Hoffman, supra,* 179 Cal.App.4th at p. 400; cf. *Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 767 [" 'facts . . . in exhibits attached to the complaint . . . , if contrary to the allegations in the pleading, will be given precedence' "]; *Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 751–752 ["allegations . . . may be disregarded if they are contrary to facts judicially noticed"].)

"In considering a trial court's order sustaining a demurrer without leave to amend, ' "we review the trial court's result for error, and not its legal reasoning." ' " (*Morales v. 22nd Dist. Agricultural Assn.* (2018) 25 Cal.App.5th 85, 93 (*Morales*).) We " 'affirm the judgment if it is correct on any theory.' " (*Ibid.*) "And when [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we

11

affirm." (*Blank*, *supra*, 39 Cal.3d at p. 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid*.)

## II.

### *The Sayeghs Cannot State a Cause of Action for Negligence*

" 'Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573; accord *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 214; see *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [describing the "well-known elements of any negligence cause of action" as "duty, breach of duty, proximate cause and damages"].)

A.    *The Dunagan Action Does Not Establish Negligence*

The Sayeghs begin by arguing that based on the Dunagan Action, the trial court was "bound to accept [CBB's] negligence," and CBB is collaterally estopped from denying negligence. Both arguments lack merit.

First, the Sayeghs contend that "[a]s a result of [CBB's] negligence, a judgment issued in favor of the Dunagans," and a trial court judge "is without power to . . . change a decision" by a judge in another department. But there was no negligence cause of action in the Dunagans' operative pleading; there were no express negligence findings in the judgment or statement of decision; and the Dunagans were borrowers, not subsequent purchasers, which would have warranted different analyses on the issues here (i.e., duty and causation).[6] Thus, nothing the trial court did here could constitute a change to the decision in the Dunagan Action. The authorities cited by the Sayeghs,

---

6    As noted above, the causes of action in the Dunagan Action were breach of contract, declaratory relief, set aside trustee's deed, cancellation of instruments, and intentional infliction of emotional distress.

which involve changes or attempted changes to other court's rulings, are inapposite. (See, e.g., *Greene v. State Farm Fire & Casualty Co.* (1990) 224 Cal.App.3d 1583, 1588–1589 [trial court erred by granting motion that had the effect of vacating a prior general order by a different judge].)

Second, the absence of a negligence cause of action in the Dunagan Action, and the differences between that case and this one, also foreclose the Sayeghs' argument for collateral estoppel or issue preclusion.

"The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case. . . . We now refer to 'claim preclusion' rather than 'res judicata' [citation], and use 'issue preclusion' in place of 'direct or collateral estoppel.' " (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.) "Claim and issue preclusion have different requirements and effects." (*Ibid.*) "*Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' " (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) "*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action." (*Ibid.*) "[I]ssue preclusion applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.)

With offensive issue preclusion, a plaintiff "seeks to prevent a defendant from relitigating an issue determined adversely to defendant in another action." (*Abelson v. National Union Fire Ins. Co.* (1994) 28 Cal.App.4th 776, 787; *Tennison v. California Victim Comp. & Government*

*Claims Bd.* (2007) 152 Cal.App.4th 1164, 1180 [" 'the offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine' "].)

The Sayeghs argue the "judgment in the [Dunagan Action] voided the trustee's title because the foreclosure was negligently and, therefore, wrongfully conducted" and CBB had a " 'full and fair opportunity' " to litigate the issue. Neither assertion has merit. The Dunagan Action did not expressly involve negligence, and the duty and causation analyses would be different regardless, because the Sayeghs are subsequent purchasers. Accordingly, CBB had no opportunity to litigate the negligence elements at issue here. (See *Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1513 [when " 'previous decision rests on "different factual and legal foundation" than the issue . . . in the case at bar, collateral estoppel effect should be denied' "].)

B.      *CBB Did Not Have a Duty of Care to Subsequent Purchasers*

The parties agree no California case has addressed whether a foreclosing lender like CBB owes a duty of care to subsequent purchasers—with whom it does not have privity of contract or privity of relationship—like the Sayeghs. So we begin by reviewing general principles of duty, as well as the factors set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) and *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 (*Bily*) to consider duty in the absence of privity. We then consider the allegations of the TAC in light of these factors. Doing so, we conclude the trial court properly determined CBB owed no duty of care to the Sayeghs.

1.      *Applicable Law*

"The general rule in California is that '[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in

14

the management of his or her property or person[.]' " (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771, quoting Civ. Code, § 1714, subd. (a).) "Whether a party has a duty of care in a particular case is a question of law for the court, which we review independently on appeal." (*Novartis, supra,* 4 Cal.5th at p. 163.) " ' " '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734, quoting Prosser, Law of Torts (3d ed.) pp. 332–333.)" (*Bily, supra,* 3 Cal.4th at p. 397.)

"Privity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58.) In *Biakanja,* the California Supreme Court "employed a checklist of factors to consider in assessing legal duty in the absence of privity[.]" (*Bily, supra,* 3 Cal.4th at p. 397, citing *Biakanja, supra,* 49 Cal.2d at p. 650.) The Court explained this determination "is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Biakanja,* at p. 650; *id.* at pp. 648–651 [notary public who drafted will owed duty of care to intended beneficiary].)

In *Bily,* the California Supreme Court considered the *Biakanja* factors in holding that an auditor's "liability for general negligence in the conduct of an audit of its client financial statements is confined to the client." (*Bily, supra,* 3 Cal.4th at p. 406; see *id.* at pp. 377–379 [reversing judgment for

investors in computer company, who sued accounting firm after company filed for bankruptcy].)  In declining to "permit all merely foreseeable third party users of audit reports to sue the auditor," the Court focused on "three central concerns":  "(1) . . . the auditor . . . faces potential liability far out of proportion to its fault; (2) the generally more sophisticated class of plaintiffs . . . (e.g., business lenders and investors) permits the effective use of contract . . . [to] adjust the relevant risks through 'private ordering'; and (3) the asserted advantages of more accurate auditing and more efficient loss spreading . . . are unlikely to occur[.]"[7]  (*Id.* at p. 398.)

2.      *Analysis*

Applying these factors, we conclude CBB, as a foreclosing lender, had no duty of care to the Sayeghs as subsequent purchasers.

We start with what we view as a critical factor here:  the ability of subsequent buyers to protect themselves.  (*Bily*, *supra*, 3 Cal.4th at p. 398 [second factor].)  In *Bily*, the California Supreme Court explained that a "third party in an audit negligence case has . . . options—he or she can 'privately order' the risk of inaccurate financial reporting by contractual arrangements with the client."  (*Id.* at p. 403; *ibid.* [third party might, among other things, "bargain with the client for special security or improved terms"].)  The Court elaborated:

> "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools.  This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources.  If, instead, third parties are simply

---

7      To the extent the parties use the term "*Bily* factors" to mean the *Biakanja* factors (or some combination of the *Biakanja* and *Bily* factors), we decline to follow suit and instead distinguish between the factors as applicable for our analysis.

permitted to recover from the auditor for mistakes in the client's financial statements, the auditor becomes, in effect, an insurer of not only the financial statements, but of bad loans and investments in general." (*Bily, supra,* 3 Cal.4th at p. 403.)

These principles squarely apply to subsequent purchasers of foreclosed property. If there is a lawsuit, and a lis pendens is filed, use of a title insurer offers at least notification of the title defect—and, thus, an opportunity to renegotiate terms or decline to proceed with the purchase. (Cf. *Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 290, 296 [trustee had no duty to later purchaser to locate Internal Revenue Service (IRS) lien and notify IRS prior to nonjudicial foreclosure sale, by statute or under *Biakanja*]; *id.* at p. 296 [usually "each purchaser . . . obtains title insurance"; insurer "will either locate the lien . . . and except it—in which case the purchaser can negotiate a new price . . . or cancel the transaction—or it will fail to locate the lien, or for other reasons choose not to except it from coverage, and the purchaser will be protected by the policy"].) If a lis pendens is not filed, protection is available through title insurance (*ibid.*) or, potentially, bona fide purchaser status (see *Hochstein v. Romero* (1990) 219 Cal.App.3d 447, 451 ["a bona fide purchaser for value who acquires his interest in real property without notice of another's asserted rights in the property takes the property free of such unknown rights"].)[8]

Thus, subsequent purchasers have the ability to protect themselves, including through their "own . . . contracting power," and, as *Bily* teaches,

---

8      Although we do not reach causation, we note the Sayeghs argue in that context that the "risk [they] assumed, if any," in buying subject to the lis pendens, was "the risk that they might be stripped of title, not that they would be left without a damages remedy." Buyers who purchase subject to a lis pendens are bound by the judgment (*Slintak, supra,* 139 Cal.App.4th at pp. 586–587), and their ability to order risk encompasses potential future monetary damages, as well as potential loss of title.

encouraging such self-reliance "promotes sound investment[.]" (*Bily*, *supra*, 3 Cal.4th at p. 403; cf. *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 710, 719–720 [addressing Quiet Title Act; "entire system of real property law in California . . . places upon real estate buyers a duty to inquire into the validity of their prospective ownership claim [citation], and to heed—not ignore—any ' "reasonable warning signs" ' "].) Accordingly, we conclude that strong public policy considerations militate against imposing a duty of care in this context.

We now consider the remaining *Biakanja* and *Bily* factors, and conclude they do not compel a different result.

The first *Biakanja* factor concerns the "extent to which the transaction was intended to affect" the plaintiff. (*Biakanja*, *supra,* 49 Cal.2d at p. 650.) There, the California Supreme Court focused on the " 'end and aim' " of the will drafting at issue (i.e., to provide for the passing of the estate to plaintiff). (*Ibid*.) In a later case involving an escrow holder, the Court focused on the "primary purpose" of the escrow. (See *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 715 [under *Biakanja* test, escrow holder was not liable to third party for issuing check pursuant to escrow instructions; "any impact . . . on [non-party assignee] was collateral to the primary purpose of the escrow"].) Both the "end and aim" of a foreclosure sale, and its "primary purpose," is to *sell the foreclosed property*. There is no basis to conclude the aim is to affect subsequent purchasers, or anyone besides the parties to the trust deeds (the Dunagans and CBB's predecessor ASB), and the successful bidder (ASB). (Cf. *Heritage Oaks Partners v. First American Title Ins. Co.* (2007) 155 Cal.App.4th 339, 346 (*Heritage Oaks*) [trustee owed no duty to later purchaser to confirm trustee status before recording deed, under nonjudicial foreclosure statutory scheme or *Biakanja*

18

factors]; *id.* at p. 343 [trustee's "interest was in selling the property to the highest bidder, regardless of whether the bidder planned to hold or to sell the property"; there was "no reason to conclude that the foreclosure sale was intended . . . to affect anyone other than the parties to the deed of trust and the successful bidder at the sale"].)

The Sayeghs claim this conclusion ignores economic realities, because given that foreclosing lenders want to sell the property, the "validity of the foreclosure process . . . is intended to affect subsequent buyers." According to the Sayeghs, "[e]xtending the duty of care to subsequent buyers minimizes the risk involved in buying property subject to litigation," and "future marketability would . . . facilitate higher prices for the banks." They seem to be saying lenders would benefit from having a duty of care to subsequent buyers, so *should* conduct foreclosures with such buyers in mind. But that does not establish lenders like CBB *do* have such intent.

We now turn to the *Biakanja* factors concerning foreseeability. (See *QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 1001 [describing " 'foreseeability of harm' " (second factor), " 'certainty . . . [of] injury' " (third factor), and " 'closeness of the connection' " (fourth factor) as relating to foreseeability, and considering them together].) The Sayeghs argue CBB "created a chain of title based on a void trustee's deed," which became part of "the stream of commerce," and it is "foreseeable that the person holding title at the end of the game . . . would be the loser." They further argue there is a "high degree of certainty" a person would have to litigate or incur costs to hold or recover title, with nothing to mitigate the "direct[ ] connect[ion]" from the injury to CBB's conduct. CBB contends impact to third parties is " 'not at all foreseeable' " or at least "negligible,"

19

because "anyone acquiring the parcel of real property after the completion of the trustee's sale will be blanketed in protections."

We do not disagree that clouded title has harmful consequences to subsequent purchasers. But as our high court said in *Bily,* " 'there are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.' " (See *Bily, supra,* 3 Cal.4th at p. 399.) It is precisely because clouded title has potentially harmful consequences to subsequent purchasers that there are protective measures like the lis pendens system and title insurance. (Cf. *Heritage Oaks, supra,* 155 Cal.App.4th at p. 347 ["if the title flaw and resulting damages were foreseeable to [defendant], they were equally so to [plaintiff]"].) Those protective measures are also what undergird our conclusion that public policy considerations do not support a duty of care here, notwithstanding foreseeability.

As for moral blame and disproportionate liability, these factors do not support a duty of care here, either. (*Biakanja, supra,* 49 Cal.2d at p. 650 [fifth factor]; *Bily, supra,* 3 Cal.4th at p. 398 [first factor].) There is nothing inherently blameworthy about a lender foreclosing on a property, and then selling it. If the lender improperly directs a nonjudicial foreclosure, it may be subject to legal action by the borrower—just as CBB was liable to the Dunagans. (See *Anderson v. Heart Federal Savings* (1989) 208 Cal.App.3d 202, 205–206, 209–210 [traditional method to challenge nonjudicial foreclosure is suit in equity to set aside sale]; *Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 398, 410 ["tort action lies for wrongful foreclosure"].) But there is no basis for expanding liability to all subsequent buyers when there is no intended effect on them, and they can

20

protect themselves by privately ordering any risk. This would impose "potential liability far out of proportion to . . . fault." (*Bily*, at p. 398.)

The Sayeghs argue CBB "had the underlying information to predict an unfavorable outcome in the Dunagan litigation, which . . . no third party would have had." They also contend "[b]anks should not be entitled to . . . plac[e] the entire risk of loss on the property owner dispossessed of title," and should at least have a duty "to the extent of the money it collected when it sold the property with a defective title." But, again, buyers who purchase a property subject to a lis pendens can and should manage their *own* risk. It is irrelevant to such buyers whether a foreclosing lender retains any sale profits after a foreclosure is voided.

Finally, imposing a duty of care on foreclosing lenders to subsequent purchasers neither limits harm, nor confers other advantages. (*Biakanja*, *supra*, 49 Cal.2d at p. 650 [sixth factor]; *Bily*, *supra*, 3 Cal.4th at p. 398 [third factor].) As noted, a foreclosing lender may already face liability, so broader liability is unnecessary to encourage careful foreclosure practices, and subsequent buyers have multiple protections. Rather, expanding liability to subsequent buyers could lead lenders to increase loan costs, and decrease availability of loans, to the detriment of the public. (Cf. *Heritage Oaks, supra,* 155 Cal.App.4th at pp. 345–346 [" 'The nonjudicial foreclosure statutes . . . reflect a carefully crafted balancing of the interests of beneficiaries, trustors, and trustees. Beneficiaries, of course, want quick and inexpensive recovery of amounts due under promissory notes in default.' "]; *Bily*, at p. 404 [auditors "may rationally respond to increased liability by simply reducing audit services"].) At the same time, it could encourage subsequent buyers to disregard available protections and engage in risky investments, knowing they can sue lenders if things go awry—also to the detriment of the public.

21

(See *Bily*, at p. 403 ["self-reliance promotes sound investment" and "discourages the careless use of monetary resources"].)

The Sayeghs contend imposing a duty of care could "deter [lenders] from marketing properties during the pendency of actions challenging title." This contention rests on the dubious assumption that a lender would still willingly make loans secured by real property, with no impact on loan cost or availability, when it might have to carry property for years after foreclosure. (Cf. *Heritage Oaks, supra,* 155 Cal.App.4th at pp. 345–346; *Bily, supra,* 3 Cal.4th at p. 404.) The Sayeghs also contend risk of loss is "best borne" by the bank, as the "loss can be amortized and spread into interest rates, fees and other sources of income," and elsewhere argue banks are "able to reduce their risk through insurance." Even assuming banks have these options, subsequent purchasers remain in the best position to manage their own risk and protect themselves.

The Sayeghs make two additional points, which we find not persuasive. First, they contend the trial court erred by focusing on purportedly inapposite issues (e.g., seller duties of disclosure), and failing to analyze the relevant factors. They also contend the duty analysis here implicates "[competing] factual allegations," and, "[a]t a minimum, the action should be remanded" for evaluation of those factors. But duty of care is an issue of law that we evaluate independently, and our review of the trial court's order sustaining the demurrer is for its result, not its reasoning. (*Novartis, supra,* 4 Cal.5th at p. 163; *Morales, supra,* 25 Cal.App.5th at p. 93.) We also assume the truth of the Sayeghs' allegations (to the extent consistent with judicially noticed facts and complaint exhibits). (*Blank, supra,* 39 Cal.3d at p. 318; *Hoffman, supra,* 179 Cal.App.4th at p. 400.)

Second, the Sayeghs argue on reply that if we do not remand for evaluation of the relevant factors, they should be permitted to "amend the complaint to allege facts supporting the imposition of a duty based on those factors" (and claim they did not address amendment in their opening brief because "the facts necessary to establish a duty do not need to be alleged with specificity"). They forfeited the amendment issue by not addressing it in their opening brief, and, in any event, do not identify any facts that would change our analysis. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 (*Stroh*) ["[p]oints raised for the first time in a reply brief will ordinarily not be considered"]; *Blank*, *supra*, 39 Cal.3d at p. 318 [burden of proving possibility of amendment is squarely on plaintiff]; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [plaintiff "must show . . .how that amendment will change the legal effect of his pleading"].)

In sum, we conclude the *Biakanja* and *Bily* factors do not support imposing a duty of care here. And because we have concluded CBB did not have a duty of care, the Sayeghs cannot establish negligence. We need not and do not reach the Sayeghs' arguments regarding causation, and proceed to their elder abuse cause of action.

III.

*The Sayeghs Cannot State a Cause of Action for Financial Elder Abuse*

"The Legislature enacted the Elder Abuse [and Dependent Adult Civil Protection Act (Welf. & Inst. Code,[9] § 15610, et seq.; (Elder Abuse Act))] 'to protect elders by providing enhanced remedies which encourage private, civil enforcement of laws against elder abuse and neglect.' " (*Arace v. Medico*

---

[9] Further statutory references are to the Welfare and Institutions Code, unless noted.

23

*Investments, LLC* (2020) 48 Cal.App.5th 977, 981–982.) An " '[e]lder' " is "any person residing in this state, 65 years of age or older." (§ 15610.27.)

Financial abuse under the Elder Abuse Act occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both." (§ 15610.30, subd. (a)(1).) Financial abuse also occurs when a person or entity "[a]ssists" in such conduct, or engages in such conduct by "undue influence." (§ 15610.30, subd. (a)(2), (3).) A plaintiff must show the person or entity "knew or should have known that [the] conduct is likely to be harmful to the elder . . . adult." (§ 15610.30, subd. (b); *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 656 [describing knowledge requirement].)

Here, the trial court properly determined the Sayeghs could not establish financial elder abuse, because a court judgment, not CBB, restored the pre-foreclosure interests and the Sayeghs did not establish any equitable interest in the restored trust deeds. We reject the Sayeghs' arguments to the contrary, as well as their claim that they can establish their equitable interest on remand.

First, the Sayeghs cannot establish CBB took or retained their property. (§ 15610.30, subds. (a)–(b).) They concede the trial court "correctly noted that '[i]t was the judgment that restored the parties' interest in the property to the pre-foreclosure interests,' " but argue the court "erred when it disregarded events that occurred after the wrongful foreclosure," including CBB's purported loss of interest after it sold to Western and later agreement not to enforce the restored deeds. Not so. The 2019 judgment in the Dunagan Action not only restored the pre-foreclosure interests in the Koala Property, but it also rendered all interests taken subject to the 2014 lis

24

pendens void—including any interest acquired in 2016 by Western from CBB, and by the Sayeghs from Western. (See *Deutsche Bank, supra,* 206 Cal.App.4th at p. 214 [third party assignment was invalid, because after judgment, there was "no interest to assign"].) When CBB agreed not to foreclose on the restored trust deeds (and later reconveyed them), the Sayeghs had no interest in or relating to the Koala Property. CBB's treatment of the deeds could not have constituted a taking or retention of the Sayeghs' property.[10]

Second, the Sayeghs' insistence that they were the equitable or beneficial owners of the restored deeds does not compel a different result. In their TAC, the Sayeghs alleged their $850,000 purchase price and signing of a purchase and sale agreement "invested them with a 'beneficial interest' in the two Trust Deeds secured against the [Koala] Property." The trial court determined the Sayeghs offered "nothing . . . to support entitlement" to such an interest, "merely because they purchased the legal title in the [Koala] Property while it was the subject of litigation." We agree.

To the extent a purchaser acquires any interest in property, it is subject to superior interests. (Miller & Starr, Cal. Real Estate (4th ed. 2015) § 10:1, pp. 10-9, 10-10 [property interest "may be judged superior or inferior

---

[10]    On reply, the Sayeghs also argue CBB "assisted in taking [their] money" (capitalization and boldface omitted) by putting property with clouded title into the market, citing the "[a]ssists" basis for financial elder abuse (§ 15610.30, subd. (a)(2)) and using the analogy of a three-car collision. They cite no cases, and engage in no reasoned statutory interpretation, for this belated, strained use of the term "assists." We do not consider it further. (*Stroh, supra*, 10 Cal.App.4th at p. 1453; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.) We likewise decline to address assertions by the Sayeghs regarding purported takings in their opening brief, which are not supported by record citations, authority, or reasoning (such as CBB's alleged "refusal to honor a modification agreement").

25

to other interests"; general rule is " 'first in time, first in right' "]; see *RC Royal Dev. & Realty Corp. v. Standard Pacific Corp.* (2009) 177 Cal.App.4th 1410, 1419 [real estate purchaser generally " 'acquires, *except against interests prior in right*, a conditional, equitable title to the property,' " on signing purchase and sale agreement (italics added); legal title passes once conditions precedent are complete].) Any interest acquired by the Sayeghs in or relating to the Koala Property, beneficial or otherwise, was invalidated by the judgment entered in the Dunagan Action. (Cf. *Stagen v. Stewart-West Coast Title Co.* (1983) 149 Cal.App.3d 114, 123 [a "judgment favorable to the plaintiff relates to, and receives its priority from, the date the lis pendens is recorded, and is *senior and prior* to any interests in the property acquired after that date" (italics added)].)

The Sayeghs' reliance on the restoration of the trust deeds is unavailing. They contend that when the Dunagan Action judgment restored the pre-foreclosure interests, CBB "received bare legal ownership of the original notes secured by deeds of trust, as recited in the Dunagan/CBB judgment," and because the Sayeghs held legal title at the time, they "should have been found to hold the equitable or beneficial ownership of the exchanged value (i.e., the notes and trust deeds)." But the Dunagan Action judgment did not distinguish between legal and equitable or beneficial ownership, or between the notes and deeds. CBB received the trust deeds because, prior to foreclosure, its predecessor was the beneficiary of those deeds.

The Sayeghs cite no authority that supports their position. The cases they do cite mainly involve differences between legal and beneficial interests in other contexts, and are inapposite. (See, e.g., *Reilly v. City and County of San Francisco* (2006) 142 Cal.App.4th 480, 489 [for property taxes, "relevant

26

inquiry is who has the beneficial or equitable ownership of the property, not who holds legal title"]; *Hansen v. Bear Film Co., Inc.* (1946) 28 Cal.2d 154, 168, 172–173 [mother's transfers of stock to son were of beneficial ownership, not just legal title, such that she had to transfer stock to his estate representative upon his death]; *Finkbohner v. Glens Falls Ins. Co.* (1907) 6 Cal.App. 379, 380, 387 [conveyance of equitable, but not legal, interest in property voided cancellation clause in insurance contract triggered by change in " 'interest, title, or possession' "]; *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 471–472 [plaintiffs could establish elder abuse claim based on allegedly abusive conduct to cause the sale of property in trust, even though transaction did not close and title did not transfer, as escrow instructions allegedly impaired property value].)

Finally, the Sayeghs argue they could establish their equitable or beneficial interest on remand by amending their complaint to plead constructive trust and/or equitable mortgage theories. We disagree.

"A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990.) Three conditions must be satisfied: "(1) the existence of a *res* (property or some interest in property); (2) the *right* of a complaining party to that res; and (3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it." (*Ibid.*)

The Sayeghs contend each element exists, because the "notes secured by trust deeds are the res"; they have the "superior beneficial interest" in them; and "CBB's detention of the res, . . . was wrongful because CBB extinguished an asset that equitably belonged to [the] Sayeghs." CBB

27

responds that a constructive trust is a remedy, not a cause of action, and the Sayeghs have not established an equitable interest to support it. The Sayeghs reply that they never suggested it was a cause of action, and they can plead the doctrine in their elder abuse cause of action.

We conclude that regardless of whether a constructive trust is viewed as a remedy, cause of action, or doctrine, it requires a property right. (See *Glue-Fold, Inc. v. Slautterback Corp.* (2000) 82 Cal.App.4th 1018, 1023, fn. 3 [constructive trust "is not an independent cause of action but merely a type of remedy"]; *Higgins v. Higgins* (2017) 11 Cal.App.5th 648, 658, 659, fn. 2 [disagreeing with *Glue-Fold*; action for "constructive trust is a suit in equity to compel a person holding property wrongfully to transfer" it to the rightful owner].) We therefore agree with CBB that the Sayeghs "have it backwards" when they claim they can use a constructive trust to *establish* their property interest.

We also reject the Sayeghs' assertion that their TAC allegations "support the imposition of an equitable lien . . . attached to the notes secured by trust deed." "An equitable lien is a right to subject property not in the possession of the lienor to the payment of a debt as a charge against that property. [Citation.] It may arise from a contract which reveals an intent to charge particular property with a debt or 'out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings.' [Citation.] 'The basis of equitable liens is variously placed on the doctrines of estoppel, or unjust enrichment, or on the principle that a person having obtained an estate of another ought not in conscience to keep it as between them; and frequently it is based on the equitable maxim that equity will deem as done that which ought to be done,

28

or that he who seeks the aid of equity must himself do equity.' " (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 453 (*Farmers*).)

Relevant factors for imposition of an equitable lien include both parties acting "under the assumption that a [property] interest exist[s]"; "conduct [that] deserves the protection of a court of equity"; "detrimental[ ] reli[ance] on the existence of a [property] interest"; and "unjust[ ] enrich[ment]." (*County of Los Angeles v. Construction Laborers Trust Funds for Southern California Admin. Co.* (2006) 137 Cal.App.4th 410, 415 (*Trust Funds*); *ibid.* [attorney, who provided services to company on mutual assumption he would be paid from settlement funds, was entitled to equitable lien on interest in such funds].)

The Sayeghs argue the Dunagan Action judgment "switched a real property interest (title to the Koala Property) for a personal property interest," and equity supports having that interest "flow to the person(s) . . . deprived of the real property interest"—that is, themselves. They cite authorities for general propositions relating to equity, including that the propriety of an equitable lien turns on the circumstances, and jurisprudence favor remedies for wrongs. (See, e.g., *Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265 ["propriety of granting equitable relief in a particular case" rests on trial court discretion, which "should be exercised in accord with . . . precedents of equity jurisprudence"]; *Brunson v. Babb* (1956) 145 Cal.App.2d 214, 229 ["equity courts look with favor upon equitable liens when employed to do justice and equity, and to prevent unfair results"]; Civ. Code, § 3523 ["For every wrong there is a remedy."].)

But the Dunagan Action judgment did not switch real property for personal property. It restored the Koala Property to its pre-foreclosure status. The Sayeghs' argument otherwise amounts to a conclusory assertion

that the equities favor them, because, as they put it, CBB wrongfully kept "ill[-]gotten profits," while they lost "millions." We disagree. Focusing on relevant factors for equitable liens, CBB and the Sayeghs did not directly interact, and CBB never recognized a property interest by the Sayeghs in the trust deeds; the Sayeghs' refusal to accept the impact of a lis pendens does not "deserve[ ] the protection" of an equity court; and any reliance by the Sayeghs on their temporary interest in the Koala Property was unreasonable. (See *Trust Funds*, *supra*, 137 Cal.App.4th at p. 415; see, e.g., *Farmers*, *supra*, 53 Cal.App.4th at pp. 450–451, 456 [insurer not entitled to equitable lien on payments received by attorney from third party tortfeasors, where "obligation to pay . . . benefits was independent of any right of reimbursement," and "matter [did] not involve considerations of detrimental reliance or unjust enrichment"].)[11]

In sum, we conclude the trial court properly granted CBB's demurrer without leave to amend.

---

[11] The Sayeghs also contend lis pendens law has improperly expanded beyond its role in quiet title litigation, and binding a non-party to a judgment violates due process. They do not establish they raised this issue in the trial court, and we decline to address it. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [reviewing court "not required to consider . . . new theory" on appeal, "even if it raised a pure question of law"]; *Jackpot Harvesting Co., Inc. v. Superior Court* (2018) 26 Cal.App.5th 125, 154 [generally " 'constitutional issues not raised in earlier civil proceedings are waived on appeal' "]; *Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 585 [declining to reach due process and equal protection arguments not raised in trial court].)

DISPOSITION

The judgment is affirmed.  Citizens Business Bank is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

31